**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**PINE BLUFF DIVISION**

TRACY D. CROFT                                                                                    PLAINTIFF


V.                                            NO. 5:07CV00275 JTR


MICHAEL J. ASTRUE,
Commissioner, Social
Security Administration                                                                  DEFENDANT


**MEMORANDUM AND ORDER**

**I. Introduction**

Plaintiff, Tracy D. Croft, has appealed the final decision of the Commissioner of the Social

Security Administration (the "Commissioner"), denying his claim for Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI"). Both parties have filed Appeal Briefs (docket

entries #11 and #13), and the issues are now joined and ready for disposition.

The Court's function on review is to determine whether the Commissioner's decision is

supported by substantial evidence on the record as a whole and whether it is based on legal error.

*Long v. Chater,* 108, F.3d 185, 187 (8th Cir. 1997); *see also*, 42 U.S.C. § 405(g). While "substantial

evidence" is that which a reasonable mind might accept as adequate to support a conclusion,[1]

"substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing

analysis:

"[O]ur review is more than an examination of the record for the existence of

---

[1] *Reynolds v. Chater*, 82 F.3d 254, 257 (8th Cir. 1996).

substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision." *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995).

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005).

On March 21, 2005, Plaintiff filed applications for DIB and SSI, alleging disability since March 16, 2005, due to several mental disorders, including depression, impulse disorder, anxiety disorder, panic attacks, short-term memory loss, and a foot problem. (Tr. 44-48; 231-35.) After Plaintiff's claim was denied at the initial and reconsideration levels, he requested a hearing before an Administrative Law Judge ("ALJ").

On November 2, 2006, the ALJ conducted an administrative hearing, where Plaintiff, his wife, and a vocational expert ("VE") testified. (Tr. 241-69.) At the time of the hearing, Plaintiff was 41-years old and had a high school education. (Tr. 245.) Plaintiff's past relevant work included jobs as a forklift driver, a machinist, and a pawn shop employee. (Tr. 246-47.)

The ALJ considered Plaintiff's impairments by way of the familiar five-step sequential evaluation process. Step 1 involves a determination of whether the claimant is involved in substantial gainful activity ("SGA"). 20 C.F.R. § 404.1520(a)(4)(I) (2005), §416.920. If the claimant is, benefits are denied, regardless of medical condition, age, education or work experience. *Id.*, § 404.1520(b), § 416.920.

Step 2 involves a determination, based solely on the medical evidence, of whether the claimant has an impairment or combination of impairments which significantly limits claimant's ability to perform basic work activities, a "severe" impairment. *Id.*, § 404.1520(4)(ii), § 416.920. If not, benefits are denied. *Id.*

-2-

Step 3 involves a determination, again based solely on the medical evidence, of whether the severe impairment(s) meets or equals a listed impairment which is presumed to be disabling. *Id.*, § 404.1520(a)(iii), § 416.920.[2]  If so, and the duration requirement is met, benefits are awarded.  *Id.*

Step 4 involves a determination of whether the claimant has sufficient residual functional capacity, despite the impairment(s), to perform the physical and mental demands of past relevant work.  *Id.*, § 404.1520(4)(iv), § 416.920.  If so, benefits are denied.  *Id.*

Step 5 involves a determination of whether the claimant is able to make an adjustment to other work, given claimant's age, education and work experience.  *Id.*, § 404.1520(4)(v), § 416.920. If so, benefits are denied; if not, benefits are awarded.  *Id.*

In his April 10, 2007, decision, the ALJ found that Plaintiff: (1) met the Act's insured status requirements; (2) had not engaged in substantial gainful activity since the alleged onset date; (3) had "severe" impairments consisting of depressive disorder NOS, anxiety disorder NOS, marijuana and alcohol dependence in remission, and antisocial personality disorder; (4) did not have impairments meeting a Listing; (5) had the RFC to perform simple and routine work, in a supervised and low stress environment, with only superficial and occasional contact with people; (6) was 41 years old with a high school education; and (7) could perform other work in the national economy existing in substantial numbers, including jobs as a landscape laborer and hand packer.[3]  (Tr. 16.)  Thus, the

---

[2]If the claimant's impairments do not meet or equal a Listing, then the ALJ must determine the claimant's residual functional capacity ("RFC") based on all the relevant medical and other evidence.  *Id.*, § 404.1520(e).  This RFC is then used by the ALJ in his analysis at Steps 4 or 5.  *Id.*

[3]Although not reflected in the ALJ's findings, he implicitly found, at Step 4, that Plaintiff could not return to his past relevant work.  At the administrative hearing, the VE  testified that a hypothetical claimant with Plaintiff's mental RFC, essentially limiting him to unskilled work, could not return to Plaintiff's past relevant work.  (Tr. 268.)

ALJ held that Plaintiff was not disabled.  (Tr. 17.)

On September 28, 2007, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making it the final decision of the Commissioner.  (Tr. 3-5.)  Plaintiff then filed his Complaint appealing that decision to this Court.  (Docket entry #2.)

## II.  Analysis

In Plaintiff's Appeal Brief (docket entry #11), he argues that: (1) the ALJ's decision was not supported by substantial evidence; (2) the ALJ erred in his Listing analysis; and (3) the ALJ did not fully and fairly develop the record.  Before analyzing each of these arguments, the Court will review the pertinent administrative hearing testimony and relevant medical evidence.

**A.      Administrative Hearing Testimony And Medical Evidence**

Plaintiff testified that he did not drive, apparently due to side effects from his medications. (Tr. 247.)  He hallucinated during the night and had problems going back to sleep without strong medication.  (Tr. 247-48.)  According to Plaintiff, heavy doses of Seroquel and Klonopin "messed him up" and made him feel like a "zombie" during the day.  (Tr. 248-49.)

Since 1995, Plaintiff was treated by a counselor or psychologist for depression.  (Tr. 249.) His depression had worsened in recent years when his ex-wife, the mother and custodian of his 12-year-old daughter, married a convicted sex offender.  (Tr. 249.)

Seroquel made Plaintiff feel hung over in the morning.  (Tr. 250.)  The medications he took during the day prevented him from driving.  (Tr. 250.)  He stayed in the bed most of the time during the day.  (Tr. 251.)  Plaintiff had tried Lithium and Trazadone in the past, but discontinued them due to side effects.  (Tr. 252.)  His medications also caused him to gain weight, up to a high of 169

pounds.[4]  (Tr. 253.)

Plaintiff had experienced suicidal ideation within the past 2 to 3 years.  (Tr. 252.)  He testified that he could not concentrate, could not handle authority, could not relate to co-workers, and had a bad temper.  (Tr. 253-54.)  Plaintiff also described having constant panic attacks and an inability to tolerate heat due to his medication.  (Tr. 254-55.)  While Plaintiff acknowledged some drug and alcohol use in the past, he had not used them since he applied for social security benefits, except for a single incident where he drank a couple of beers.  (Tr. 257-58, 261-63.)  Plaintiff vaguely described a problem with using his right hand, due to the surgical removal of a sixth digit when he was born.  Plaintiff also testified that he suffered a broken arm from falling out of a pick-up truck and "massive head trauma" from getting into fights.  (Tr. 259.)

Plaintiff's wife, Laura Croft, testified that Plaintiff did not use drugs or alcohol except for a single incident where he consumed two beers, which caused an adverse reaction with his medications and resulted in him being taken to the emergency room.  (Tr. 266.)

On January 12, 2004, Plaintiff was seen by Dr. Ron Wauters at Southeast Arkansas Behavioral Healthcare System for a medication maintenance appointment.[5]  (Tr. 181.)  Plaintiff reported having run out of medication, but was doing "reasonably well today."  Dr. Wauters diagnostic impressions along the DSV-IV axes were as follows: (axis I) depressive disorder NOS;

---

[4]Plaintiff was 5'7" and normally weighed 110 pounds.  (Tr. 252-53.)

[5]The medical record suggests that Plaintiff had an established treatment history with Dr. Wauters and the Southeast Arkansas Behavioral Healthcare System.  However, the earliest document reflecting that Plaintiff was seen by Dr. Wauters is dated January 12, 2004.  The medical record also is  unclear as to the exact medications and dosages Plaintiff was taking at any given time.  However, it appears that Plaintiff generally took some combination of Clonazepam (Klonopin), Fluoxetine (Prozac), and Seroquel.  (Tr.  132-33.)

anxiety disorder NOS, marijuana dependence in early remission by history, and alcohol dependence in early remission by history; (axis II) antisocial personality disorder; (axis III) no diagnosis; (axis IV) problems with the social environment and primary support group; and (axis V) a GAF of 55.[6] Dr. Wauters continued Plaintiff's medications, without making any changes.

On March 16, 2004, Plaintiff was seen at Southeast Arkansas Behavioral Healthcare System by therapist Joyce Walker to address his goal of decreasing mood swings. (Tr. 180.) Plaintiff reported doing "somewhat better," although he had lost a job due to "rageful behavior" toward his boss. Plaintiff also indicated a desire to file for disability. Ms. Walker noted "some response" to intervention and "a little progress."

In a medication maintenance appointment on April 15, 2004, Plaintiff reported walking out of a job because he was "just too stressed out" and "could not handle" dealing with the public. (Tr. 179.) Plaintiff expressed an interest in filing for disability, and reported being clean and sober for 3 months. Dr. Wauters increased Plaintiff's Prozac and maintained his Klonopin.

In a medication maintenance appointment on August 9, 2004, Plaintiff reported doing "reasonably well" on his medication. (Tr. 178.) Plaintiff asked Dr. Wauters if he should apply for disability and what "he should use as his diagnosis." Plaintiff reported being sober. Dr. Wauters continued Plaintiff's current medications.

---

[6]Plaintiff's GAF of 55 places him in the middle of the "moderate" impairment range of social/occupational functioning: "Moderate symptoms ( e.g., flat affect and circumstantial speech, occasional panic attacks ) OR moderate difficulty in social, occupational, or school functioning ( e.g., few friends, conflicts with peers or co-workers )." *See Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. Text Revision 2000). As set forth in greater detail below, Plaintiff returned to Dr. Wauters for a number of medication maintenance appointments. In the medical records reflecting these visits, Dr. Wauters consistently repeats the same diagnostic impressions, and a GAF of 55.

In a medication maintenance appointment on October 22, 2004, Plaintiff reported not sleeping, and looked angry and irritable. (Tr. 177.) Dr. Wauters added a trial of Seroquel to Plaintiff's medications.

In a medication management appointment on December 28, 2004, Plaintiff reported that things were going quite well, with no particular complaints, concerns, or problems with side effects. (Tr. 176.)   Dr. Wauters continued Plaintiff's current medications.   On March 8, 2005, Plaintiff reported to Dr. Wauters that he had an increase in his stressors, but that his medications were helping him some. (Tr. 175.) Dr. Wauters continued Plaintiff's current medications.

On April 4, 2005, Plaintiff was seen by Ms. Walker for an individual therapy session. (Tr. 173-74.) Among other things, Plaintiff related not being able to work, diminished daily activities, paranoia, and hearing voices.   Ms. Walker noted that Plaintiff had suffered from symptom exacerbation and had "little response to intervention."  They discussed "behavioral strategies" to address his depression, and case management services, which Plaintiff declined.  On May 3, 2005, Plaintiff presented to Ms. Walker with pressured speech and seemed very anxious and angry. (Tr. 172.) Ms. Walker reinforced the need for Plaintiff to stay sober, and discussed ways to prevent relapse.  She also noted "some progress" and "some response to intervention."

On May 3, 2005, Plaintiff reported to Dr. Wauters doing "okay" overall, with no problems except difficulty with sleep. (Tr. 171.) Dr. Wauters maintained his medications.

On May 21, 2005, Plaintiff went to the ER complaining of chest pain and hyperventilating from drinking. (Tr. 160.) Plaintiff was diagnosed with alcohol intoxication, and discharged with instructions not to drink alcohol with the medications he was taking. (Tr. 160, 163.)

On June 28, 2005, Plaintiff saw Ms. Walker and reported being sober since the incident that

required him to be taken to the hospital.  (Tr. 168.)  Petitioner discussed the sources of his depression, the fact that he played guitar and rode his motorcycle some, but that on other days he could not get out of bed due to depression.  Ms. Walker noted "some response to intervention" and "some progress."

On August 2, 2005, Plaintiff reported to Dr. Wauters that he was doing okay overall, and that he "got turned down" for disability which he understood was a probability.  (Tr. 167.)  They discussed the possibility of increasing his Prozac, and no other problems were noted.  Dr. Wauters maintained Plaintiff's medications.  The same day, Ms. Walker noted that Plaintiff had made "some progress" and "some response to intervention."  (Tr. 166.)

On September 15, 2005, Plaintiff reported to Dr. Wauters that he was doing well on his medications, with no complaints or concerns.  (Tr. 225.)  Dr. Wauters continued Plaintiff's current medications.

On December 8, 2005, Plaintiff reported to Dr. Wauters that he was doing okay overall, with no particular complaints or concerns.  (Tr. 224.)  Plaintiff felt that his combination of Klonopin, Prozac, and Seroquel was working reasonably well.  Dr. Wauters continued Plaintiff's current medications.

On August 28, 2006, Dr. Wauters completed a checklist-form "Medical Assessment of Ability to Do Work-Related Activities (Mental)."  (Tr. 227-28.)  Dr. Wauters assessed Plaintiff as having a "good" ability to maintain personal appearance and behave in an emotionally stable manner; a "fair" ability to relate to co-workers, use judgment, function independently, understand and carry out simple/detailed job instructions, and demonstrate reliability; and a "poor" ability to follow work rules, deal with the public, interact with supervisors, deal with work stress, maintain

attention/concentration, understand and carry out complex job instructions, and to relate predictably in social situations.  In a portion of the checklist used for providing medical/clinical findings to support the assessment, Dr. Wauters's handwritten notation is difficult to read.  (Tr. 228.)  While the parties do not elaborate on what this notation says, it appears to state "anxious nervous, suspicious at times."  (Tr. 228.)

**B.      Plaintiff's Arguments Supporting Reversal Of The ALJ's Decision**

       **1.      The ALJ's Decision Is Not Supported By Substantial Evidence**

Plaintiff begins by arguing that he met a Listing (*Pltf's App. Br.* at 4-5), a point that he also raises as his second independent ground for reversal.  Accordingly, the Court reserves the discussion of this argument until later in this analysis.

Plaintiff next argues as follows:

> The [ALJ] failed to address several issues in evaluating Plaintiff's claim, such as: (1) Plaintiff's mental disability was not properly evaluated; (2) failure to consider lack of finances; and (3) the ALJ discredited Plaintiff's mental illness, stating Plaintiff's symptoms have consistently improved and are well controlled with medication.  This case was not properly evaluated and all of the evidence was not reviewed when the ALJ made his decision.  The ALJ's evaluation of disability on the basis of Plaintiff's mental disability was impaired in that the ALJ discredited all of Plaintiff's symptoms stating Plaintiff is doing well with no new complaints.

(*Pltf's App. Br.* at 5.)  Plaintiff also cites Dr. Wauters's RFC checklist as evidence that his case "was not properly evaluated."  (*Pltf's App. Br.* at 5-7.)  The Court interprets these arguments as challenging the ALJ's mental RFC determination and his assessment of Plaintiff's credibility.

In his decision, the ALJ found that the medical evidence established that Plaintiff suffered from functional limitations resulting from his mental disorders, but that Plaintiff "remains capable of performing work that is simple and routine, in a supervised and low stress environment, with only

occasional and superficial interpersonal contact with people." (Tr. 13, 16.)  Plaintiff emphasizes

the limitations contained in Dr. Wauters' mental RFC checklist, which are more restrictive than

those assessed by the ALJ.  The ALJ specifically noted Dr. Wauters's RFC assessment, and

discounted it for the following reasons:

> The [ALJ] acknowledges that Dr. Wauters reported on August 22, 2006 that
> [Plaintiff] had a poor or no ability in most areas of work related mental functioning.
> However, the medical findings submitted by Dr. Wauters and otherwise documented
> in the record do not support a finding that [Plaintiff's] medical condition si disabling.
> As noted above, Dr. Wauters repeatedly noted that [Plaintiff] was doing well, with
> no new complaints or concerns.  This treating physician appears to have taken
> [Plaintiff's] subjective allegations at face value in making his assertion, one which
> does not necessarily take into account the other factors which must be considered by
> the [ALJ], such as the other medical reports and opinions as well as the vocational
> factors involved.  The treating physician's opinions has been considered but, in view
> of the overall record, is found not to be persuasive.

(Tr. 13.)

Social Security regulations generally provide that opinions from treating sources are entitled

to greater weight than others, and further establish specific factors to be applied in determining their

ultimate weight.  *See* 20 C.F.R. § 404.1527(d) (identifying such factors as the length of the treatment

relationship, frequency of examination, consistency with other evidence in the record, the specialty

of the physician, and the evidence cited in support of the opinion); *see also Samons v.* Astrue, 497

F.3d 813, 819 (8th Cir. 2007) (holding that a treating physician's opinion may be discounted when

the opinion is conclusory or inconsistent with the evidence of record); *Wilson v. Chater*, 76 F.3d 238,

241 (8th Cir. 1996) (holding that an opinion of a treating physician may be properly discounted where

it is unsupported by clinical or diagnostic data).  As noted by the ALJ, Dr. Wauters' checklist was

inconsistent with his own medical records which, for the most part, indicated that Plaintiff was doing

well with his medications.  As noted in the "mental status examination" portion of Dr. Wauters'

records, Plaintiff consistently presented with cooperative behavior, clear speech, and never appeared

to be a danger to himself or others. In the course of treating Plaintiff, Dr. Wauters never restricted

Plaintiff's work activity in any way. Dr. Wauters consistently assessed Plaintiff as having a GAF of

55. While this is consistent with moderate restrictions in mental/social functioning, it is inconsistent

with the severe level of restrictions in the RFC checklist. Moreover, Dr. Wauters completed the RFC

checklist in August of 2006, approximately 8 months after his last documented visit with Plaintiff

in December of 2005. (Tr. 224, 228.) Finally, other than a cryptic and difficult to read notation,

Dr. Wauters did not document any medical/clinical findings supporting his checklist. (Tr. 228.)

Under these circumstances, the Court concludes that the ALJ did not err in discounting

Dr. Wauters's RFC checklist, and that Dr. Wauters's clinical treatment notes support the ALJ's RFC

assessment. Additionally, after reviewing the complete record, the Court concludes that the ALJ,

in evaluating Plaintiff's credibility, followed the factors found in *Polaski v. Heckler,* 739 F.2d 1320

(8th Cir. 1984), and took into account matters such as his daily activities, medications, and the

medical record before deciding that Plaintiff's subjective complaints were not fully credible.[7]

## 2.    The ALJ Erred In His Listing Analysis

According to Plaintiff, the ALJ erred in finding that he did not meet the Listings "under 12.00

et seq for mental disorders." (*Pltf's. App. Br.* at 8.) Beyond this reference to the *entire family* of

mental disorder Listings in the Social Security regulations, Plaintiff does not specify what Listing

---

[7]The Court notes Plaintiff's conclusory assertion that the ALJ "fail[ed] to consider lack of finances." (*Pltf's. App. Br.* at 5.) Based on the Court's review of the administrative record, there was never any issue raised below concerning Plaintiff's inability to pay for treatment. In fact, it appears that Plaintiff was able to maintain a course of mental health treatment including both medications and therapy.

he purportedly met.[8]

The ALJ analyzed Plaintiff's mental impairments under Listing 12.04 for affective disorders. (Tr. 11-13.) The ALJ specifically found that Plaintiff did not satisfy either the "B" or "C" criteria of the Listing.[9] Plaintiff seems to argue that he met the "B" criteria, *i.e.*, he had 2 or more of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation, each of extended duration. However, Plaintiff has not

---

[8]In a later portion of Plaintiff's Appeal Brief, he contends that he "meets Listings 42:123-42:127," citing various evidence in the record that satisfies "§ 42:123 - Activities of daily living," "§ 42:124 social functioning," "§ 42:125 concentration, persistence, and pace," "§ 42:126 deterioration or decompensation in work or work-like settings," and "§ 42:127 effect of medication." (*Pltf's. App. Br.* at 8-14.)   These are *not* citations to the Social Security Listings or regulations.  It appears to the Court that Plaintiff is citing to chapters and subsections from an unidentified social security treatise.

[9]Among other things, Listing 12.04 requires a claimant to establish affective disorders:

B.      Resulting in at least two of the following:
  1.  Marked restriction of activities of daily living; or
  2.  Marked difficulties in maintaining social functioning; or
  3.  Marked difficulties in maintaining concentration, persistence, or pace; or
  4.  Repeated episodes of decompensation, each of extended duration;
OR
C.      Medically documented history of a chronic affective disorder of at least 2
        years' duration that has caused more than a minimal limitation of ability to do
        basic work activities, with symptoms or signs currently attenuated by
        medication or psychosocial support, and one of the following:
  1.  Repeated episodes of decompensation, each of extended duration; or
  2.  A residual disease process that has resulted in such marginal adjustment that even a
minimal increase in mental demands or change in the environment would be predicted to
cause the individual to decompensate; or
  3.  Current history of 1 or more years' inability to function outside a highly supportive
living arrangement, with an indication of continued need for such an arrangement.

20 CFR Pt. 404, Subpt. P, App. 1, § 12.04.

identified *medical evidence*, other than his subjective complaints, demonstrating that he met at least two of these criteria. For a claimant's impairments to match a Listing, they must meet all of the specified medical criteria; an impairment that meets only some of the criteria, no matter how severely, does not qualify. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Simply put, Plaintiff failed to meet his burden of coming forward with medical evidence sufficient to establish that he met a Listing.

### 3.    The ALJ Erred In Failing To Fully And Fairly Develop The Record

Plaintiff's last argument is that the ALJ did not adequately develop the record, and relied on the opinions of non-treating, non-examining physicians to support his determination of Plaintiff's RFC.  According to Plaintiff, the  ALJ should have sought an opinion from Plaintiff's treating physicians, or alternatively, a consultative examination.   Plaintiff goes on to argue that the inadequate record provided no evidentiary support for the ALJ's RFC and his hypothetical question to the VE.

These arguments are almost identical to those raised previously by Plaintiff in attacking the ALJ's RFC determination.  For the reasons stated previously, the Court concludes that they are without merit.  (*See* discussion, *supra,* at 9-11.)  Finally, Plaintiff has not shown that there were crucial undeveloped or underdeveloped issues warranting further examinations or consultation.  *See Smith v. Barnhart*, 435 F.3d 926, 929 (8th Cir. 2006) (duty for ALJ to develop administrative record may include seeking clarification from treating physicians if a crucial issue is undeveloped or underdeveloped).

### III.  Conclusion

It is not the task of this Court to review the evidence and make an independent decision.

Neither is it to reverse the decision of the ALJ because there is evidence in the record which contradicts his findings.  The test is whether there is substantial evidence in the record as a whole which supports the decision of the ALJ.  *E.g., Mapes v. Chater*, 82 F.3d 259, 262 (8th Cir. 1996); *Pratt v. Sullivan*, 956 F.2d 830, 833 (8th Cir. 1992).  The Court has reviewed the entire record, including the briefs, the ALJ's decision, and the transcript of the hearing.  The Court concludes that the record as a whole contains ample evidence that "a reasonable mind might accept as adequate to support [the] conclusion" of the ALJ in this case.  *Richardson v. Perales*, 402 U.S. at 401; *see also, Reutter v. Barnhart*, 372 F.3d 946, 950 (8th Cir. 2004).  The Court further concludes that the ALJ's decision is not based on legal error.

IT IS THEREFORE ORDERED that the final decision of the Commissioner is affirmed and Plaintiff's Complaint is DISMISSED, WITH PREJUDICE.

DATED this 3rd day of December, 2008.

_____
UNITED STATES MAGISTRATE JUDGE